## BURCHILL et al. v. HERMSMEYER.
### (No. 7144.)

(Court of Civil Appeals of Texas. San Antonio. April 23, 1924. Rehearing Denied May 28, 1924.)

**1. Corporations ⚫⟶116—Buyer of oil stock could not recover purchase price because misled by statements of spiritualist, in absence of fraud or deception on part of seller.**

Buyer of stock in oil company could not recover purchase price on the ground that he was induced to buy the stock by the statements of a spiritualistic medium, in absence of fraud or deception on part of seller.

**2. Corporations ⚫⟶121(5)—Admission of evidence as to buyer's faith in spiritualism and effect on mind in buyer's action for purchase price of oil stock held error.**

In buyer's action to recover purchase price of oil stock for fraud and his incompetency, in which there was no evidence that seller took advantage of buyer's faith in spiritualism, admission of evidence as to buyer's faith in spiritualism and effect thereof on mind *held* error.

**3. Evidence ⚫⟶548—Facts held insufficient basis for opinion of alienist.**

Opinion of alienist that plaintiff was mentally incompetent to make the contract in suit, based on an hour's conversation with plaintiff, and the fact that plaintiff believed in spiritualism, which the alienist did not believe in, *held* inadmissible, as founded on insufficient data.

**4. Appeal and error ⚫⟶1053(1)—Admission of subsequently withdrawn evidence held prejudicial.**

In buyer's action to recover purchase price of oil stock for fraud and his incompetency, in which there was no evidence that seller took advantage of buyer's faith in spiritualism, admission of evidence as to buyer's faith in spiritualism, and an alienist's opinion of the effect thereof on mind, *held* prejudicial to seller, though subsequently withdrawn from jury.

**5. Evidence ⚫⟶317(4) — Testimony as to statement made to plaintiff by spiritualist held inadmissible as hearsay.**

In buyer's action to recover purchase price of oil stock for fraud, in which there was no testimony connecting seller with statements made to buyer by spiritualist, evidence as to statements made by spiritualist to buyer *held* not admissible, being hearsay.

**6. Appeal and error ⚫⟶1050(1)—Evidence as to statements made by spiritualist to plaintiff held harmless.**

In buyer's action to recover purchase price of oil stock for fraud, in which there was no testimony connecting seller with statements made to buyer by spiritualist, evidence as to statements made by spiritualist to buyer, though inadmissible as hearsay, was harmless.

**7. Witnesses ⚫⟶383—Evidence of witness on former trial as to immaterial matter not admissible for impeachment.**

Testimony of witness on former trial as to immaterial matter was not admissible to impeach witness.

**8. Evidence ⚫⟶471(1)—Testimony constituting merely opinion held not admissible.**

Testimony constituting merely an opinion or conclusion of the witness *held* not admissible.

**9. Trial ⚫⟶304—Jurors should not be permitted to read newspaper comments on issues.**

Jurors should not be permitted during the course of a trial to read newspapers containing comments on the issues in the case on trial.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Suit by H. C. Hermsmeyer against Belle M. Burchill and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

Greathouse & Wade, of Fort Worth, for appellants.

Slay, Simon & Smith and F. M. Brantly, all of Fort Worth, for appellee.

FLY, C. J. This suit was instituted by appellee against Belle M. Burchill, Edna M. Burchill, and Fort Worth Oil Development Company, the latter having Belle M. Burchill as its president, and Edna M. Burchill as its secretary, to recover $10,000, which appellee claimed was obtained from him by the appellants by fraud and misrepresentation. Appellee pleaded that at the time he was dealing with appellants and investing his money in oil that did not materialize he "was a believer in the theories, practices, predictions, and phenomena of spiritualism and spiritualistic mediums, but the defendants were not such believers; and 'by reason of such belief and faith by plaintiff he had the utmost faith and confidence in the ostensible revelations, statements, and representations of such mediums, and by reason thereof his mind was in an abnormal and irrational condition, and plaintiff, by reason thereof, accepted and acted upon such revelations and representations as truth; and on account of this irrational state of his mind he was not capable of understanding the nature, quality and consequences of his acts when based upon and induced 'by supposed revelations and statements of such mediums, when made by such mediums as representations by them of the existence of facts, past, present, or future. And, knowing of this state and condition of the mind of plaintiff, and of plaintiff's belief and faith in the power of persons known as spiritualistic mediums or clairvoyants, to see and perceive things and substances that are invisible to, and beyond the perception of, ordinary persons, but defendants themselves having no faith or belief in such phenomena, and designing to take advantage of plaintiff, overcome his will and overreach him, and to induce him thereby to part with his money, at and prior to each of the transactions, represented to, and caused to be represented

to plaintiff, that divers persons, spiritualistic mediums, had been able to perceive, and had perceived, extensive deposits of oil within and underneath said land, and that such mediums had so stated to defendants, and that defendants had been so informed by such mediums, and likewise caused one Kaiser, a person well known as a spiritualistic medium, and other such mediums, to make like statements to plaintiff as to the existence of oil in said land and beneath the surface thereof, each and all of which representations and statements plaintiff believed to be true and same were relied upon by plaintiff as the statements of actual facts." The other misrepresentations alleged were that appellants would return the money advanced by appellee if no oil was procured in paying quantities, and, although no oil was discovered, the advances were not returned.

In a long answer all of the allegations of fraud were denied and set up contracts in writing by and between the parties, to the effect that appellee was a shareholder in the oil company, and took his chances in the venture, which proved to be a failure.

The cause seems to have been submitted on special issues, although the transcript does not contain the charge, except as copied into the judgment in connection with the answers of the jury, and judgment was rendered in favor of appellee for $13,271.65.

The jury found that an assignment was made by the Palo Pinto Oil & Gas Company to appellee to secure him in his money advances; that the assignment was not made to evade payment of commissions to one Wood; that appellants agreed to refund money advanced by appellee, if he decided not to take stock in the Fort Worth Oil & Development Company, but did not at the time the promise was made intend to comply with it, although appellee credited, relied, and acted on such promise; and Mrs. Belle M. Burchill never in good faith offered to return the $10,000 advanced by appellee.

One hundred and twenty-two pages of the transcript, of 206 pages, are devoted to bills of exception, and the brief of appellants contains 83 pages of typewritten matter, in which appear 17 assignments of error and 14 propositions, with citation of 35 authorities. A thorough investigation of the voluminous record and long brief has consumed considerable time and energy of this court, some of which possibly might have been conserved, and the same ends more expeditiously, if not pleasantly, reached through a shorter record and more concise brief. However, "what is writ, is writ."

This is a third appeal of this cause, the first being reported in 212 S. W. 767, and the second in 230 S. W. 809.

According to the statement made by the Court of Civil Appeals, the right to recover on the first appeal was based on certain false and fraudulent representations made by Belle M. Burchill to appellee, and that at the time the stock subscription contract was made the two Burchills agreed to return to appellee his $10,000 subscription in the event no oil was found. While it is not shown that the spiritualistic influence over the mind of appellee was pleaded, yet the court states that the evidence was allowed to wander out into the mysterious realms where disembodied spirits make their abode, and the court said:

"We do not care to say that spirits from the great beyond may not visit and communicate with the living, nor that it is impossible for man's spiritual powers to be so developed and purified as to constitute a medium for communication with disembodied beings, for the phantasm of to-day is so often a reality of to-morrow. But these subjects belong to realms and powers that as yet must generally be classed as purely speculative, and not so established by evidences cognizable by the law which we are required to administer as to be classed as facts—as among proven things. Indeed, we think it may be said that a belief that the living, through the agency of a medium, can receive authentic information from the spirits of the dead, is, in the general acceptance of mankind, a species of delusion, and that such communications, in general acceptance, are of too unsubstantial a character to be received as representations of fact."

The court held that statements made by the Burchills to the effect that spirits had revealed, through a medium, the existence of oil in valuable quantities beneath the land in question could not form a basis for relief for the plaintiff.

On the second appeal of this case the judgment was reversed on account of the introduction of testimony to impeach Mrs. Burchill on a matter not material to any issue in the case, and it was held that, if the promise to return the $10,000, if no oil was discovered, was made with no present intention to perform it, she would be bound. It was also held that, unless it was shown that the mediums were instigated by Mrs. Burchill to make the representations as to the presence of oil in the land, she could not be held responsible for such representations.

[1] The judgment on the second appeal was reversed in April, 1921, and the third trial, from the result of which this appeal has been perfected, took place on February 12, 1923. The issue of the insanity or unsoundness of mind of appellee was not raised by the evidence, and was not submitted to the jury. Neither was there any testimony to establish a theory, which under proper circumstances might arise, that advantage was taken of a weakness or delusion. We think that, if Mrs. Burchill, knowing that appellee was credulous enough to credit and act upon the representations of so-called mediums that they had the mysterious power of calling "spirits from the vasty

deep," and believed that they would come when called, and bring messages from the regions of "desolate windswept space, in twilight land, in no man's land," in regard to such material but evasive things as crude petroleum oil, should move and instigate the medium to make the necessary spiritual revelations and encourage appellee to act upon them, she might be liable for taking advantage of such weakness and delusion. But, in the absence of proof that Mrs. Burchill had taken advantage of the weaknesses and hallucinations of appellee along the lines of spiritualism, she would not be liable for his responses to his messages from the dead. In the ordinary affairs of life a person dealing with another cannot be held responsible for the lack of business sense in the other, unless he has in some way, by fraud or deception, taken advantage of the weakness or lack of business acumen in the other. A party to a contract cannot be held liable for the false representations of mediums patronized by the other party, unless he acted in collusion with such mediums.

[2, 3] The allegations in the supplemental petition as to the mental incapacity of appellee and of the fraudulent collusion of appellants with mediums to mislead and deceive appellee are full and ample, but they are not supported by proof and were not passed upon by the jury. In the absence of advantage being taken of appellee in regard to his hallucinations and vagaries about communication of the spirits of the dead, appellee should not have been permitted to place before the jury the allegations of his third amended original petition as to the belief of appellee in spiritualism and clairvoyance. No valid reason can be given for permitting such testimony before the jury, and that was followed by the evidence of Dr. J. R. Needham, who swore that he was an alienist, that he had not known appellee until the day on which he testified, and had talked to him "the best part of an hour," and that he did not think appellee was mentally competent to enter into a contract involving the expenditure of $10,000 in an oil transaction, and that "a man who is mentally incompetent to enter into a contract * * * is more pliable and more easily to be subjected to influences than a man who is not in that condition." He swore that appellee had delusions on the subject of spiritualism. The doctor said:

"He believes that men can see things that no other mortal man can; he believes in dematerialization of the body, that I, as a doctor, don't believe in at all."

He further stated:

"I think the man has delusions in this regard. He said, in regard to the mediums of spiritualism, that people could foretell and foresee, divine, receive information, etc. He said that you had to test these people out, whether it took long years or not."

The doctor explained "dematerialization of the human body is for the body itself to disappear so it is not tangible, so that you cannot lay your hands on it." The doctor obtained all his knowledge of appellee in less than an hour, from what appellee told him, while the cause was on trial. The doctor's idea of the meaning of "delusion" was "false belief," and a "false belief" was anything that the witness, "as a doctor, don't believe in at all." These "false beliefs" about spiritualism the doctor admitted were the only basis for the statement by the alienist that appellee was mentally incompetent. The testimony of the witness was long drawn out along the lines indicated; the gist of it being that the doctor deemed any man crazy who had "delusions," that is, "false beliefs," that is, about matters that the witness, "as a doctor, don't believe in at all."

There is a large number of religionists who believe that men can be cured without the administration of drugs or medicines, and those people from the standpoint of the medical witness are suffering under "delusions," "false beliefs," which can meet with no sanction from the doctor, and, necessarily, reasoning from his premises, evidence of mental incompetency. There are men that believe that most of our physical ills can be cured by manipulating the vertebræ, and these must be "delusions" or "false beliefs," which are evidences of mental incapacity to attend to business affairs, because doctors of the regular schools usually do not believe in them. The evidence was based upon the conviction of a physician as to the sanity of a man, based on his observation and conversation with him for less than an hour, in which he had learned that the man was a believer in spiritualism, in which the doctor did not believe. Upon this belief of the man in spiritualism the witness based his theory that the man's mind was unhinged and that he was incompetent to invest money in an oil enterprise which proved a failure. The evidence of any man claiming to be an expert on insanity must be based on sufficient knowledge and the adequacy of the scope of observation of the person about whose sanity the evidence is given. Wigmore on Evidence, § 689. We do not think that the witness qualified himself to testify by showing such observation of the person claimed to be mentally incompetent to attend to business, and basing his testimony alone upon certain beliefs that the person examined said he entertained. No act, no word of appellee, outside of his belief in spiritualism, was shown as a basis for the opinion of the doctor. Such belief alone did not evidence insanity. If absurd beliefs, and almost idiotic conceptions as

262 S.W.—33

to the laws of nature, as well as to matters of religious faith, could be made a basis for a charge of incapability to attend to the ordinary business affairs of life, possibly a number of our citizenship would be affected. No man has the right to set himself up as a judge in matters of religious opinion, nor dictate to others in questions of belief and faith. What is truth, enrobed in her most brilliant garb, in the mind of one man, may be a "delusion" in the eyes of another, and who shall pronounce the decree as to the sanity of the one or of the other. Yet this authority has been assumed by the alienist in this case, and a man condemned to the status of one mentally unfitted for the ordinary business affairs of life, because he believes that the inhabitants of the shadow land hold converse with certain people in the flesh. Similar evidence to this, in this same case, was held on a former appeal to be incompetent and inadmissible, standing alone, and it should have been excluded.

[4] After the evidence had all been given by the witness before the jury, and no doubt fully absorbed by them, the court instructed the jury not to consider the testimony for any purpose. Appellants had done all they could to induce the trial court to prevent the testimony from going to the jury, but it was permitted to be iterated and reiterated before the jury, and must have found such lodgment in their minds that a mere admonition to not consider could not have removed even though each juror had endeavored not to consider it. Often the actions of men are shaped and influenced by matters so subtle and insinuating that they may not realize the influence themselves, and a prejudice once planted in the mind and heart of a juror may like a noxious weed in rich soil not only flourish but bring forth a numerous progeny. The testimony was admitted by the court, and he stated that he would not remove the jury, but would hear the testimony, and, if he concluded it should not be admitted, would withdraw it from consideration. The damage, however, had been done, the evil effects had been accomplished. As said by the Supreme Court, through Judge Stayton, in Railway v. Levy, 59 Tex. 542, 46 Am. Rep. 269:

"The practice of admitting improper evidence, with the promise or expectation of subsequently directing the jury not to consider it, or of controlling it by the charge, is not to be encouraged; for upon minds misdirected in legal investigations, and excited by sympathy aroused by recitals of apparent hardship, such directions or instructions will usually be found impotent to efface impressions once made."

On the ground of the admission of improper testimony, although afterwards excluded, the judgment was reversed and the cause remanded. The same doctrine was reiterated in Tucker v. Hamlin, 60 Tex. 171; Railway v. Thomas, 63 Tex. Civ. App. 312,

132 S. W. 974; and Gulf Pipe Line v. Hurst (Tex. Civ. App.) 230 S. W. 1024.

Appellee had alleged fraud and misrepresentation and insanity, and the issue of fraud was submitted, and it was found by the jury to have caused appellee to enter into the contract, and it is probable that their action in finding fraud might have been influenced by the belief that appellants were dealing with a man who had been pronounced insane by a man expert in mind diseases. There was no testimony that Mrs. Burchill steered appellee "to one Frank Kaiser, a medium," but Mrs. Burchill and appellee agree that the latter knew Kaiser, and that he introduced appellee to Mrs. Burchill when she came to Kaiser's house to get the address of one Wood, to whom she wished to write. There is no testimony tending to show, as asserted in appellee's brief, "that Kaiser, by the procurement of the said appellant, made his revelation as to the existence of oil under the ground, and told Hermsmeyer to go to Montana and go down a certain lane, at the end of which was a house with a yellow gable, in which lived a man who would buy his place for $10,000, and in the same connection repeated his revelation as to the existence of oil under the ground." Appellee points to no testimony sustaining the assertion, and we have been unable to discover such testimony. Appellee swore that he did go to Montana, did find the house with the yellow gable at the end of the lane, and did find the man who paid him the $10,000. Probably appellee had provided, unthoughtedly, the material for the revelation as to the lane and the house, and of the probability of the occupant of the house desiring to purchase his Montana home, and doubtless the verification of the message of the medium as to the matters in Montana caused appellee to believe in the assertions of the medium as to the existence of oil beneath the land. If appellee was induced by the medium to invest everything he had in the search for oil, it was his belief in the medium, and not in Mrs. Burchill, that caused him to do it. There may have been fraud in causing appellee to think he was lending money instead of investing it, but, if so, the promise to restore it and not the mediumistic revelation caused him to make the loan.

Nothing, except a belief in spiritualism, was offered to show that appellee was not normal in his mental faculties. He knew how to run his farm, how to sell it, to work in repair shops, and respond to the ordinary demands of existence, and he acted also under the advice and with the aid of an adult son, whose mental qualities were not assailed. Even at the time of the trial appellee was employed in a railroad shop, and he knew how to employ eminent counsel, and how to assist him very materially in the testimony. He alleges that he is of unsound

mind, and yet he is permitted to enter the courts of the state and prosecute a claim without the assistance of a next friend or a guardian.

[5, 6] In the absence of testimony connecting appellants with the revelations of the medium made to appellee, the evidence as to what Kaiser told appellee about selling his Montana farm, and the existence of oil under the soil, tended to show that appellee did not act upon the representations as to the oil made by Mrs. Burchill, and it did not injuriously affect appellants. However, the evidence was hearsay, and should not have been admitted.

[7, 8] The ninth proposition is sustained. The testimony of Mrs. Burchill, on a former trial introduced to impeach her, was on an immaterial matter. Hermsmeyer swore that nothing was said about oil the first time he saw Mrs. Burchill, and what did it matter if she at one time said oil was mentioned? The testimony objected to in the tenth proposition was trivial, and should not have been admitted, being nothing but an opinion or conclusion of the witness.

[9] During the course of a trial jurors should not be permitted to read newspapers containing comments on the issues in the case on trial. Jurors may believe that they were not influenced by such articles, but the reading of them does not assist the jury in arriving at a proper conclusion, and may influence their action. This is said in view of the fact that at least two of the jury read an article in a local paper giving the newspaper's conception of the case on trial, and stating that on two former trials juries had rendered verdicts in favor of appellee. This was calculated to influence the action of the jurors who read it.

The other matters of which complaint is made will not arise on another trial, and need not be discussed.

The judgment is reversed, and the cause remanded.

For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes