### In re RAMON'S ESTATE. (No. 8218.)

Court of Civil Appeals of Texas. San Antonio. July 24, 1929.

Rehearing Denied Oct. 9, 1929.

Hicks, Hicks, Dickson & Bobbitt, of San Antonio, Pope, Pope & Pope, of Laredo, and Schlesinger & Schlesinger and Harry L. Howard, all of San Antonio, for appellants.

Mann, Neel & Mann, of Laredo, for appellee.

SMITH, J. This is a proceeding to probate the will of Eugenio T. Ramon, deceased, in which he sought to devise his entire estate, other than that embraced in a few minor specific bequests, to his niece, Alice Louise Worsham. The probate of the will was contested by other relatives than the principal devisee, including an alleged common-law wife. The contest failed in both the county and district courts, the will was ordered probated, and the contestants have appealed. The contest was based upon the contentions that the testator was without testamentary capacity, and that he executed the will in response to undue influence exercised upon him by the mother of the principal devisee.

Appellants attack the findings of the jury that the testator was possessed of testamentary capacity and was not unduly influenced, urging that those findings were without support in the evidence, and were contrary to the preponderance of the evidence. We have very carefully considered the testimony in the case, and conclude that the evidence is substantially in conflict upon the issues mentioned, and that the jury findings thereon were fully warranted. That being the case, neither the trial court nor this court has the authority to disturb those findings. These matters are raised in appellants' second and third propositions, which must be overruled.

Angelita Sobrevilla de Ramon claims to be the common-law wife of the deceased testator, and because of that claim was made a party to the proceeding by the proponent of the will. She thus assumed the position of a contestant of the will. Evidence was offered by the contestants to establish the alleged claim of Angelita Ramon that she was the common-law wife of the testator, presumably

in support of the contestants' contention that the will, which cut off Angelita from the estate, was an unnatural one. In rebuttal of this claim, the proponents put on testimony tending to show that Angelita's relation to the testator was not that of a lawful wife, but was illicit. The contestants vigorously contend that this evidence was inadmissible, and prejudicial besides. We conclude, however, that as appellants opened up the issue of the true relations between Angelita and the testator, and adduced material evidence to support the legality of those relations, they cannot complain that appellees met them upon their own ground with testimony tending to disprove the legality of those relations. Appellants' first proposition is overruled.

 During the direct examination of the principal beneficiary while a witness upon the stand, counsel for appellees asked and she answered the following question:

"Q. Well, did she (Angelita Sobrevilla de Ramon) or did she not come to your mother's home in May of 1926? A. Yes, sir, she came.

"Q. What was the purpose of her visit? A. She came to tell mother that uncle (the testator) was sick and he thought he was very sick, and wanted my name written down on a piece of paper and—"

At this juncture the witness was interrupted by counsel for appellants, who objected to her testimony upon the ground that she was attempting to testify to statements made by the deceased testator in his lifetime, and that such testimony was prohibited under the familiar provisions of article 3716, Rev. St. 1925. After some discussion between the court and counsel, counsel for appellees, although expressing his belief in the admissibility of the testimony, but desiring to avoid any possible error, withdrew the question, and the court instructed the jury not to consider the testimony. Counsel for appellee then asked the witness: "What statements if any did Angelita Sobrevilla ever make to you with regard to her relationship to Eugenio T. Ramon?" Upon appellants' same objection, appellee withdrew that question, and asked this one: "What claim if any did Angelita Sobrevilla ever make in your presence as to wages due her after the death of Eugenio T. Ramon?" Appellants made a like objection to the question and contended to the court that appellee was seeking by indirection, by asking and then withdrawing questions, to get improper evidence to the minds of the jurors. Counsel for appellee vigorously repelled this charge, insisting that the questions were asked in good faith in the belief that the testimony sought to be elicited was admissible, but had been withdrawn in order to avoid any question of error. After some discussion the trial court overruled appellants' objection to the question last quoted, which was repeated to the witness, who answered that she did not understand the question. Counsel for appellee then stated the question in a different form, as follows: "Well, I will put it this way: Subsequent to the death of Eugenio T. Ramon, did you or did you not have any conversation with Angelita Sobrevilla, leaving out now anything that she may have told you that Ramon said —after the death of Eugenio T. Ramon, what conversation if any did you have with Angelita Sobrevilla?" The witness did not answer the question, repeated to her in different forms, upon her explanation that she could not dissociate the statements of Angelita Ramon from the testator. It is not necessary to decide if the testimony sought to be elicited by the questions asked and objected to would have been inadmissible, of which there is some doubt. It is only sufficient to say that the testimony actually admitted, about which appellants could complain, was stricken and the jury instructed to disregard it, and none of it remaining in evidence was so definite or prejudicial as to have been harmful to appellants. It is apparent that appellees sought to restrict the witness' testimony against any invasion of the domain prohibited in article 3716, and the matters raised in appellants' fourth proposition, here under consideration, present no harmful error, if any.

 In their fifth proposition appellants complain of the closing argument of appellees' counsel in which it was stated counsel for appellants did not tell the jury that Angelita Ramon, the alleged common-law wife, would receive half of the estate in controversy, regardless of the testator's will; that the testator had accumulated all the property in controversy. There is nothing in the bill of exception concerning this transaction to negative the assumption that this argument was provoked by the argument of appellants' counsel, nor did appellants, although objecting to the argument at the time it was made, request the court to direct the jury to disregard it. Such a motion is incumbent upon a party complaining of an improper jury argument, unless, indeed, the objectionable argument is of such inflammatory, prejudicial, and uncalled for nature as to be incurable by any instruction from the court, as is sometimes the case. The record does not disclose such to be the case here, and we cannot say the trial judge abused his discretion when he failed to so instruct the jury upon his own motion, and afterwards overruled a motion for new trial embracing the assignment of error now under consideration.

 Appellants' eighth assignment of error, submitted as the sixth and final proposition, is that: "The Court erred in refusing to permit the contestants over the objections of Proponent that same was irrelevant and immaterial to any issue in the case and that no predicate had been laid to introduce such testimony and that there are various and sundry kinds of insanity and that contestants offered to prove that Manuel Ramon, a brother

of the testator herein, had three times been adjudged insane by proceedings duly had in the County Court of Webb County, Texas, and had been confined in the Southwestern Insane Asylum at San Antonio, Texas, and that the executor, Thomas Worsham, Jr., had taken advantage of the feeble minded condition of other members of the Ramon family and in furtherance of his design and scheme to secure possession of the feeble minded Ramon family, that the said Thomas Worsham, Jr. had secured deeds to all of the property of the said Manuel Ramon, for the reason that said testimony was relevant upon the issues of the system of the Worsham Family in exercising undue influence over the mentally unbalanced members of the Ramon family and bore directly upon the issue in this cause of the undue influence exercised by the members of the Worsham family over the testator herein."

It is obvious that no specific ruling or action of the trial court is pointed out in this assignment, nor is the purpose of the assignment apparent from its language, which is correctly copied from the transcript into appellants' brief, and quoted above. The assignment in this form presents nothing for review.

The judgment is affirmed.

COBBS, J. (dissenting). This cause originated in the county court of Webb county, wherein the will of Eugénio T. Ramon, deceased, was offered for probate and the application therefor was contested.

The will was executed on two grounds: First, that Ramon did not have testamentary capacity at the time he executed the will offered for probate; and, second, that he was unduly influenced in making said will.

The proposed will is as follows:

"The State of Texas, County of Webb:

"I, Eugenio T. Ramon of the County of Webb and State of Texas, being of sound and disposing mind and memory, and being desirous to settle my worldly affairs while I have strength to do so, do make and publish this, my last will and testament, hereby revoking all others heretofore made.

"First: I desire and direct that my body be buried in a decent and Christianlike manner, suitable to my circumstances and condition in life.

"Second: I desire and direct that my just debts be paid out of my estate without delay, by my executor to be hereinafter appointed.

"Third: I give, bequeath and demise to Javier Guajardo the sum of One Hundred ($100.00) Dollars cash out of the money I have in my safe.

"Fourth: I give, bequeath and demise to my servant, Angelita Sobrevilla, the sum of One Hundred ($100.00) Dollars out of the money I have in my safe to be paid over to her by my executor at the rate of Ten ($10.00) Dollars per month.

"Fifth: It is my will and desire that all of my property, both real and personal, I may die seized and possessed of, after the payment of all my just debts and the payment of the foregoing legacies, together with all the expenses incident to the probating of this will, shall pass to and vest in fee simple in my beloved niece, Alice Louise Worsham, to manage, sell or dispose of as she wish or see proper.

"Sixth: I hereby constitute and appoint my beloved brother-in-law Thos. Worsham, Jr., executor of this, my last will and testament, and direct that no bond or security be required of him as executor.

"Seventh: It is my will that no other action shall be had in the County Court in the administration of my estate than to prove and record this will and to return an inventory and appraisement of my estate and list of claims.

"In testimony whereof I have hereunto set my hand this 10th day of May, A. D. 1926.

"E. T. Ramon.

"Signed, declared and published by Eugenio T. Ramon, as his last will and testament, in the presence of us, the attesting witnesses, who have hereto subscribed our names in the presence of said Eugenio T. Ramon at his special instance and request, this 10th day of May, A. D. 1926.

"D. M. Valdez
"H. F. Valdez, Jr."

The court charged the jury:

"Did the deceased, Eugenio T. Ramon, at the time of making the will in question, have testamentary capacity as that term has been defined herein?

"Answer yes or no.

"We, the jury, answer Issue Number One: Yes.

"In connection with Special Issue No. 1, you are charged that the words 'testamentary capacity' as used herein means that to make a valid will the person making the will must have testamentary capacity at the time of the execution of the will. By testamentary capacity is meant that the person at the time of the execution of the will has sufficient mental ability to understand the business in which he is engaged, the effect of his act in making the will and the general nature and extent of his property. He must also be able to know his next kin and the natural objects of his bounty. He must have memory sufficient to collect in his mind the elements of the business to be transacted and to hold them long enough to perceive at least their obvious relations to each other and to be able to form a reasonable judgment as to them."

We are not at liberty to discuss the question of deceased's alleged common-law marriage, for the reason that it was not submitted to the jury as a controlling issue. One reason may be because it was supposed, and it is doubtless true, that the share of the common-law wife would not be here affected

by the decree of the court in probating the will, as the wife's share in the community estate was invested in her, and she would be left free to preserve it in another trial. In fact, the marriage does not seem to be sufficiently involved, though unfavorably discussed by appellants before the jury.

If the deceased was not insane in the meaning of the term, he was yet, as expressed by some of the witnesses, so mentally unbalanced as to be called "nutty." There was a volume of testimony introduced condemning his mental attitude towards persons and things, and those who were clearly concerned and close to him expressed grave doubts as to his sanity.

Augustin Salinas testified that evening (when the will was executed) he saw an automobile at the door of deceased and saw both Mr. Valdezes there, Higinio and Daniel, and: "I went there and took a chair that was there and went into another room, and when they left the door open and it was in May and the bed was pretty near the door and I went and closed the door a little bit, and by the time I came back and took a chair and put it there he was crying and crying hard just like a baby. Ramon was crying. He had a paper in his hand," which was the will.

Angelita Sobrevilla de Ramon, the common-law wife, was made a party to this suit by the proponent, but no action of the court was had thereon. She was pictured to the jury by the proponent as a woman of loose morals, whose relations with the deceased for 30 years were adulterous, and that she had given birth to three illegitimate children. This was done to prejudice the jury against the contestant.

This evidence was offered on the issue as to whether the will was an unnatural will. It was improper and prejudicial in connection with the attacks upon the character of Angelita de Ramon, the alleged common-law wife of deceased. The proponent did not claim to be making an attack upon the character of the contestant, but it certainly was an effective and evasive method of holding the contestant as a woman unworthy of the sympathies and consideration of the jury. We think this prejudicial. Burchill v. Hermsmeyer (Tex. Civ. App.) 262 S. W. 511.

A great many witnesses testified that the deceased was "nutty" and had what may be called an "oblique mind." No witness testified that he knew what he was doing with his property and to whom he was giving it, and who were dependent upon him or who his nearest kin were. The true test of sanity was not expressly given.

We do not believe the jury, when they answered that deceased had testamentary capacity, quite understood the issue they were called upon to decide.

A. R. Garcia, a very competent witness, was well acquainted with the deceased and knew him all his life. He said the young boys called him "El loco Eugenio," crazy Eugenio. Hal L. Brennan testified to the same effect.

On the question of unsoundness of mind, the proof showed that the deceased got on the house top in a nude condition and danced and sang out and cried aloud to the heavens to open up. A. R. Garcia testified that deceased would go around to see Mr. Worsham, and that Mr. Worsham would run him out of the house, and he would tell us. "I want to see my sister and Mr. Worsham did not want me and ran me away."

This is a most unnatural will, and there is nothing in the record to account for it and to show any reason or motive on the part of Eugenio Ramon for leaving his estate and property to Alice Louise Worsham, and disinheriting his wife, his sister, his brother, and his numerous nephews and nieces, except it be for a want of sufficient mental faculty to permit him to realize the absurdity of his act. Such wills are always regarded by the courts with a jealous eye.

Where the findings of the jury are not sufficient to support the judgment, we unhesitatingly set them aside. As said in G. C. & S. F. Ry. Co. v. Gaddis et al., 208 S. W. 895, 896, by the Commission of Appeals, through Justice McClendon: "We are met with the suggestion that a contrary opinion has been reached by twelve jurors, a trial judge, and three judges of the Court of Civil Appeals, from which it is urged that such conclusion must be reasonable. We are not unmindful of the force of this suggestion. However, the reasonableness of a conclusion to be drawn from undisputed facts is not to be tested by the reasonableness of the individuals who arrive at it, but by the inherent soundness or reasonableness of the conclusion itself; and, when such question is presented to an Appellate Court for decision, such court must decide the question for itself, untrammeled by what other minds may have concluded, and with the consciousness that its own conclusion may not in every instance meet the full approval of others equally capable but not charged with the ultimate duty of decision. A different conclusion by other minds is, of course, persuasive, which fact makes valuable the opinions of other jurisdictions not binding, as a matter of law, upon this jurisdiction. But in the last analysis each court is charged with the duty and must for itself determine the question of reasonableness of a particular conclusion from a given undisputed state of facts; and, with all deference to those with whom we here differ, we have been unable to reach any other reasonable conclusion but that contributory negligence as a matter of law is shown in this case."

On the question of undue influence, D. M. Valdez, the lawyer who wrote the will, testified: "This paper that you hand me purports to be E. T. Ramon's will. I have seen this paper before; I wrote it myself. I pre-

pared that will. I prepared it at the request of Mrs. Tom Worsham. * .* .* She took me personally to his house to see him. She took me to the house of E. T. Ramon. The data that I wrote that will from was given me by Mrs. Worsham and Eugenio, both of them were present. * * * Well, when I went up there Mrs. Worsham, as I stated a while ago, took me in her automobile with her son-in-law, whose name is Mr. Garcia, and I went in there and she got out of the car with me, and she told Eugenio, 'here is Mr. Valdez, he is going to write the will for you,' and he said, 'All right.' She said, 'You want to leave everything to my daughter, Alice, and write it up that way?' * * * Before I went out there I want to state that Mrs. Worsham told me that she wanted me to go down to Eugenio Ramon's to write the will in the morning, and I got busy and forgot and she phoned me and asked me, and I told her no, that I had not, and she said, 'I guess I had better come and take you,' and she came and took me to the house. That was all the same day. * * * I stated that Mr. Augustin Salinas came in when I was there the last time while this will was being executed. He came in just about the time we were ready to leave. He came in about the time I put it in the envelope and handed it to Mr. Ramon. * * * I do not remember that Mr. Ramon had ever consulted me on any legal matters prior to that. I do not recall any time that I ever acted as his attorney in any case. * * * As to discussing with me the provisions of the will in the car before we got there, she told me that she understood Eugenio wanted to leave everything to her daughter, Alice. She told me that she wanted me to go out there and draw the will and she understood that he was to leave everything to her daughter, Alice. * * * I drew the will and under the terms of that will this property was left to Alice Worsham. There were no other bequests made in there; all the property was devised to Alice Worsham. Alice Worsham is the daughter of Tom Worsham and the Mrs. Worsham I referred to in my testimony here—the daughter of the woman I went there with. * * * I stated a while ago on direct examination that Mrs. Worsham stated to Ramon, 'You are going to leave everything to Alice, my daughter, aren't you?' And Ramon answered, 'Yes, sir.' The first time that I called there Mrs. Worsham did enter into the discussion of the provision of the will. * * * When I went out there, Mrs. Worsham stated to him, 'Mr. Ramon, here is Mr. Valdez, to. draw your will,' and stated to him, 'You are going to leave everything to my daughter Alice, aren't you?' and he answered, 'Yes, sir.' * * * During those conferences that I had with Eugenio Ramon there were three suggestions made; one was that Mrs. Thomas Worsham, who was Cayetana Worsham,

suggested that he leave all of the property to her daughter—she made that remark, and he said 'yes'; I suggested to him that Thomas Worsham, Jr., be named executor of this will, and he said, 'Well, I think it is all right; I think he is the proper person.' And I suggested that Thomas Worsham, Jr., be named the independent executor and that no bond be required of him, and he readily yielded to that suggestion."

I do not go into and discuss other questions raised, as it is not necessary. I think the case has been carelessly tried and that justice has not been administered and for that reason believe the same should be revised. I cannot afford to let a judgment stand on such testimony.

I cannot agree with my associates and file this as my dissent.